## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

DAVID ROHALIA SAMPSON,

      Petitioner,

v.                            Case No. 8:20-cv-2242-CEH-CPT

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

## ORDER

      David Rohalia Sampson, a Florida prisoner, timely filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1.) Respondent filed a response opposing the petition. (Doc. 10.) Sampson did not file a reply. Upon consideration, the petition will be **DENIED**.

## I.    Procedural History

      A state-court jury convicted Sampson of two counts of aggravated assault with a deadly weapon. (Doc. 10-2, Ex. 2, pp. 76-79.) The jury made a special finding that Sampson "actually possess[ed] and discharge[d] a firearm during the commission of the offense[s]." (*Id.*) The state trial court sentenced Sampson to the mandatory minimum of twenty years' imprisonment, and the state appellate court *per curiam* affirmed the convictions. (*Id.*, pp. 82-86; *id.*, Exs. 11, 13, 14.) Sampson subsequently sought postconviction relief under Florida Rule of Criminal Procedure 3.850. (*Id.*, Ex.

18, pp. 4-54.) The state trial court denied Sampson's claims, and the state appellate court *per curiam* affirmed the denial of relief. (*Id.*, pp. 440-54; *id.*, Exs. 21, 22.) This federal habeas petition followed. (Doc. 1.)

## II.     Facts; Trial Testimony[1]

This case arises from an altercation that took place outside a residence in Clearwater, Florida. Sylvia Littles resided in the house with her father. On the afternoon of November 21, 2014, Littles was sitting on a chair in her driveway. She was accompanied by Christopher Reed (her son), Alexis Reed (her daughter), Danielle Spencer, and Christina Thompsona.

Kristina Nelson—who lived "[t]hree houses down" and was in a romantic relationship with Christopher Reed—walked toward the Littles residence with three men. (Doc. 10-2, Ex. 6, pp. 280, 402-03, 469-70.) As Nelson approached the house, she began "yelling about money." (*Id.*, p. 280.) The two groups "yell[ed] and scream[ed]" at each other in the driveway for approximately fifteen minutes. (*Id.*, pp. 282, 440.) One of the men with Nelson—later identified as her cousin, David Sampson—said, "I want the n****r that was messing with my cousin." (*Id.*, p. 420.) Nelson responded, "Drop them bitches," whereupon Sampson pulled out a handgun and fired several shots in the direction of Christopher Reed. (*Id.*, pp. 284, 309-10, 378.) The bullets did not hit anyone. Nelson ran back to her house; Sampson and the other two men ran down the street to their car, a gray Nissan Altima, and drove away.

---

[1] This summary is based on the trial transcript.

Michelle Strovar and her fiancé Bradley Alford lived across the street from Littles. They witnessed the incident from their porch. After the shooting, Strovar called 911, described the incident, and informed the operator that the license plate on the gray Nissan Altima read DHNI63 or DHN163. She later told law enforcement that the shooter was a "heavyset," "bald," "dark male" who wore a "light blue shirt" and "blue jeans." (*Id.*, pp. 287-88.) Alford likewise described the shooter as a "tall, heavier set" male who wore a "light blue shirt with blue jeans." (*Id.*, p. 333.)

Littles, Spencer, and Alexis Reed subsequently identified Sampson as the shooter from a photographic lineup. In addition, Littles testified at trial that the shooter was "kind of chunky," wore "a white t-shirt with some blue . . . writing in the front" and "blue jeans," and had gold teeth. (*Id.*, pp. 406-10.) Spencer testified that the shooter was a "heavyset" male wearing a "blue shirt" and "blue jeans." (*Id.*, pp. 367, 382.) Although Christopher Reed was unable to identify Sampson from a photographic lineup, he (1) testified that the shooter wore "a blue shirt and blue jeans" and had gold teeth, and (2) identified Sampson as the shooter at trial. (*Id.*, pp. 481-83.) Thompsona likewise failed to identify Sampson from a photographic lineup, but she subsequently testified that the shooter had "gold teeth," and she identified Sampson as the perpetrator at trial. (*Id.*, pp. 508, 511-12.)

Following his arrest, law enforcement found that Sampson "had gold teeth." (*Id.*, p. 237.) Law enforcement also discovered that Sampson's girlfriend owned a gray Nissan Altima with the license plate DHNI63. The other license plate number given to the 911 operator, DHN163, did not "exist." (*Id.*, pp. 576-77.) Moreover, after

3

reviewing several birth certificates and creating a "family tree," law enforcement determined that Sampson and Nelson were "first cousins." (*Id.*, pp. 562, 568.)

## III.    Standards of Review

### A.     AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The state appellate court affirmed Sampson's convictions, as well as the denial of postconviction relief, without discussion. These decisions warrant deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

## B.    Ineffective Assistance of Counsel

Sampson alleges ineffective assistance of trial counsel. Ineffective-assistance-of-counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and

resulting prejudice. *Id.* at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Sampson must show that counsel's alleged error prejudiced the defense, because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, Sampson must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

## IV.   Discussion

### A.   Ground One

Sampson contends that trial counsel was ineffective for failing to impeach Sylvia Littles with "numerous and material prior inconsistent statements she told police at the scene." (Doc. 1, p. 15.) First, Sampson cites the inconsistency between (1) Littles' trial testimony that Christopher Reed "was already outside with her when [] Nelson and the three men" arrived, and (2) Littles' statement to police that Reed "emerged from the residence" only after the argument with Nelson and the three men "escalated." (*Id.*, pp. 13-14.) The state postconviction court held that counsel "was not

deficient in failing to impeach [] Littles on this issue." (Doc. 10-2, Ex. 18, p. 441.) The court explained that Littles' testimony did not concern "a material, significant fact, but a mere detail that occurred prior to the offense." (*Id.*)

The state court reasonably concluded that counsel was not deficient for failing to highlight this minor inconsistency. *See, e.g.*, *Monteleone v. Sec'y, Dep't of Corr.*, No. 8:15-cv-686-CEH-AEP, 2018 WL 1316234, at *6 (M.D. Fla. Mar. 14, 2018) ("Counsel's decision not to highlight minor inconsistencies on largely immaterial matters . . . was not ineffective assistance of counsel."); *Haag v. Sec'y, Dep't of Corr.*, No. 8:14-cv-1794-MSS-AEP, 2017 WL 6550884, at *20 (M.D. Fla. Sept. 25, 2017) (holding that failure to "highlight every minor inconsistency between [the witness's] deposition testimony and his trial testimony does not rise to the level of constitutional error").

Second, Sampson points out that, while Littles told law enforcement "the shooter was wearing a light blue" t-shirt, she subsequently testified at trial that the shooter wore a white t-shirt "with blue writing on it." (Doc. 1, p. 14.) The state postconviction court concluded that counsel was not deficient for failing to highlight this inconsistency. The court correctly observed that "[n]early all other witnesses identified the shooter [as] wearing a blue shirt." (Doc. 10-2, Ex. 18, p. 443.) The court then stated that it was "unclear . . . why counsel would impeach the witness with a prior statement that would further corroborate the other witnesses' testimony." (*Id.*)

"Counsel's decision to cross-examine and the manner of the cross-examination are strategic decisions entitled to deference." *Ferrell v. Sec'y, Dep't of Corr.*, No. 8:12-cv-

194-SDM-AEP, 2016 WL 5719472, at *10 (M.D. Fla. Sept. 30, 2016) (collecting cases). A strategic decision by counsel, such as how or whether to cross-examine a witness, constitutes ineffective assistance "only if it was so patently unreasonable that no competent attorney would have chosen it." *Kelly v. United States*, 820 F.2d 1173, 1176 (11th Cir. 1987). Here, the state court reasonably concluded that counsel had a sound strategic reason to refrain from "impeach[ing] [Littles] with a prior statement that would further corroborate the other witnesses' testimony." (Doc. 10-2, Ex. 18, p. 443.) Other attorneys "might have made the strategic call[] differently, but [this Court] cannot say that no reasonable attorney would have done as" counsel did here. *Wood v. Allen*, 542 F.3d 1281, 1309 (11th Cir. 2008), *aff'd*, 558 U.S. 290 (2010).

Third, Sampson points to the discrepancy between (1) Littles' trial testimony that, just before the shooting began, Nelson said, "Fuck that, lay their fuck ass down," and (2) Littles' statement to law enforcement that Nelson said, "Drop them bitches." (Doc. 1, p. 14.) In his Rule 3.850 motion, Sampson also highlighted the discrepancy between (1) Littles' trial testimony that Sampson said, "I want the n****r that was messing with my cousin," and (2) Littles' statement to law enforcement that Sampson said, "[Y]ou can't mess with my cousin like that." (Doc. 10-2, Ex. 18, p. 26.)

The state postconviction court concluded that Sampson "fail[ed] to establish that counsel was deficient because these [were] not inconsistent statements." (*Id.*, p. 444.) The court reasoned that, although Littles "used different verbiage to describe these statements, the messages in the statements [were] the same." (*Id.*) The court also observed that "all of the witnesses [who] testified to hearing statements gave similar

8

but varied versions of these statements." (*Id.*) And, "[a]s to the second statement," the court noted that "both versions contain[ed] the similar language of 'messing with my cousin.'" (*Id.*) The court explained that "[t]he use of the word cousin was important because it established a link between [Sampson] and Kristina Nelson as they are first cousins." (*Id.*)

The state court reasonably concluded that counsel was not deficient for failing to impeach Littles on these points. "Whether [Littles'] statement[s] to police [were] [] prior inconsistent statement[s] is an issue of state law, and a state court's determination of state law receives deference in federal court." *Miller v. Sec'y, Dep't of Corr.*, No. 8:17-cv-2815-TPB-AEP, 2020 WL 7318967, at \*34 (M.D. Fla. Dec. 11, 2020), *aff'd*, No. 21-10077, 2022 WL 3452468 (11th Cir. Aug. 18, 2022); *see also Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017) ("[A]lthough the issue of ineffective assistance . . . is one of constitutional dimension," a court "must defer to the state's construction of its own law when the validity of the [ineffective-assistance] claim . . . turns on state law."). To be sure, the wording of Littles' statements varied. But the gist of her testimony— that Nelson instructed her companions to attack the other group of people, and that Sampson expressed anger toward the person who was "messing" with his cousin— remained the same. *See Barwick v. Crews*, No. 5:12-cv-159-RH, 2014 WL 1057088, at \*6 (N.D. Fla. Mar. 19, 2014) (rejecting ineffective-assistance claim based on failure to impeach witness because "the gist of [the witness's] testimony was generally consistent on each occasion"), *aff'd sub nom. Barwick v. Sec'y, Fla. Dep't of Corr.*, 794 F.3d 1239 (11th Cir. 2015). The state court reasonably concluded that counsel was not ineffective

for failing to cross-examine Littles about inconsequential differences in her description of the events.

Fourth, Sampson points out that "Littles testified [at trial that] the shooter pulled the gun from his right front pocket," but told law enforcement that "it was his back pocket." (Doc. 1, p. 14.) He also points to the discrepancy between (1) Littles' trial testimony that "she saw the shooter and the other two men run, get into a small gray car[,] and leave the scene," and (2) her statement to police that "after the shooting had stopped, she re-emerged from her house and discovered that [] Nelson and the three men had left." (*Id.*)

With respect to these alleged inconsistencies (and the other inconsistencies discussed above), the state postconviction court held that Sampson "fail[ed] to establish that he suffered prejudice." (Doc. 10-2, Ex. 18, p. 444.) The court based this conclusion on the "significant evidence presented against [Sampson] at trial":

> Michelle Strovar indicated that the shooter wore a light blue shirt and blue jeans, was a heavyset black male and was bald. She testified that the shooter fired five to seven shots and then fled down the street to a car. Michelle Strovar's 911 call was played, in which she gave a similar description of the suspect, stated that the vehicle used was a gray Nissan Altima, and identified the tag as DHNI63 or DHN163. Bradley Alford testified that he also observed the shooting and identified the shooter as a heavyset, bald, black male wearing a light blue shirt with blue jeans and carrying a chrome pistol. Mr. Alford indicated that the vehicle the suspect fled in was a silver Nissan Altima. Danielle Spencer testified that the shooter was a heavyset black male wearing a blue shirt who fired at Christopher Reed and then fled to a nearby Nissan Altima. Ms. Spencer further testified that the shooter wore blue jeans and identified the Defendant via photopack and in court as the shooter. Sylvia Littles testified that three men approached her residence with a neighbor [Kristina Nelson] and began an argument. She indicated that the shooter was chunky with gold teeth, was wearing blue jeans and a white t-shirt

10

with blue on the front. Ms. Littles identified the Defendant in court and in [the] photopack as the shooter and testified that the Defendant made a statement that he wanted the person "that was messing with my cousin." Alexis Reed testified that she was present for the shooting, saw the men flee to a gray Nissan following the shooting, and identified the Defendant as the shooter via photopack and in Court. Christopher Reed testified that he had a sexual relationship with Kristina Nelson and that she was present with the three men prior to the shooting. Mr. Reed testified that the shooter made a statement that "somebody's going to pay for messing with my cousin" shortly before the shots were fired. Mr. Reed testified that the shooter was backing up down the street while he fired and that he fled in a gray Nissan Maxima. Mr. Reed testified that the shooter had gold teeth, was wearing blue jeans and a blue shirt, and identified the Defendant as the shooter in court. Christina Thompsona testified that she saw a group of guys and Kristina Nelson coming down the street, that the shooter had gold teeth and a small handgun and identified the Defendant as the shooter in court. Detective Suess testified that he generated a family tree for Kristina Nelson to determine if the Defendant and Kristin Nelson were cousins. Detective Suess testified that he was able to confirm that the Defendant and Kristina Nelson were first cousins. Detective Suess also testified that the tag number identified by the witnesses for the vehicle at the scene was linked to a 2012 gray Nissan Altima registered to Marsha Eady and that the Defendant had made many calls to Marsha Eady during the pendency of his case. Marsha Eady testified that she is the Defendant's girlfriend and owns a gray Nissan Altima with the tag DHNI63. Deputy Busch testified that after the Defendant was arrested, he was identified to have gold teeth. Because of the substantial evidence against the Defendant presented at trial, the Defendant fails to establish that he suffered prejudice due to counsel's failure to impeach Ms. Littles on [these issues].

(*Id.*, pp. 442-43 (record citations omitted).)

The state court reasonably concluded that, even if counsel was ineffective for failing to adequately impeach Littles, the ineffective-assistance claim failed for lack of prejudice. The court accurately recounted the extensive evidence against Sampson, including multiple eyewitness identifications of him as the shooter, his girlfriend's ownership of the car in which the shooter fled the scene, and his status as Nelson's

first cousin. Given the "substantial evidence of [Sampson's] guilt," "there is no reasonable probability the outcome of the trial would have been different had counsel impeached [Littles] in the manner suggested." *Thornton v. Sec'y, Fla. Dep't of Corr.*, No. 3:17-cv-64-MMH-JBT, 2019 WL 5268812, at *14 (M.D. Fla. Oct. 17, 2019).

For all of these reasons, Ground One is denied.

**B.    Ground Two**

Sampson contends that trial counsel was ineffective for (1) failing to impeach Alexis Reed with "her prior statements to police," and (2) "failing to call" the officer who interviewed her "for such impeachment." (Doc. 1, p. 16.) Sampson identifies two alleged inconsistencies in Reed's statements. First, he notes that "Reed testified [at trial] that just prior to the shooting, [she] heard Kristina Nelson say, 'Lay them MF down.'" (*Id.*, p. 17.) In her statement to law enforcement, however, Reed failed to mention that Nelson had said "anything prior to when the shooter began firing his gun." (*Id.*) Second, Sampson states that Reed "testified [at trial] that the shooter told [] Nelson he 'didn't come over here for nothing' and 'he come to do what he got to do.'" (*Id.*) When she spoke to law enforcement, however, Reed "reported that someone in the group asked, 'Where's that forty dollars?'" and that "one of the males with [] Nelson said, 'I ain't 'bout this talking and squashing s***, I'm about to lay y'all out.'" (*Id.*)

The state postconviction court rejected this claim. It explained that Sampson's "characterization of [] Reed's testimony" was "not completely accurate." (Doc. 10-2, Ex. 18, p. 445.) Although Reed initially testified that Nelson had said, "Lay them MF

down," she subsequently clarified that she could not "remember" Nelson's "statement." (*Id.*, Ex. 6, pp. 438-49.) The court ultimately held that Sampson "fail[ed] to establish that he suffered prejudice based on the identification of [him] as the shooter and the evidence linking him to the crimes as noted above." (*Id.*, Ex. 18, p. 445.)

The rejection of this claim was reasonable. Even assuming that counsel was deficient for failing to impeach Reed with her prior statements, the prosecution presented substantial evidence that Sampson was the shooter. As a result, "there is not a reasonable probability that the outcome of the trial would have been different had [] counsel impeached [Reed] with her prior" statements. *Broadwater v. United States*, 347 F. App'x 516, 520 (11th Cir. 2009). Furthermore, the "impeachment value" of those prior statements was "weak." *Miller*, 2020 WL 7318967, at *28. As the state court noted, Reed admitted at trial that she could not remember what Nelson said before the shooting began. Moreover, had counsel highlighted Reed's prior statement that one of the men with Nelson said he was "about to lay y'all out," the jury might have concluded that the speaker was Sampson, and that he was threatening violence. The Court cannot say that counsel's decision to refrain from impeaching Reed with these statements "was so patently unreasonable that no competent attorney would have" made the same choice. *Kelly*, 820 F.2d at 1176. Accordingly, Ground Two is denied.

## C.    Ground Three

Sampson argues that trial counsel was ineffective for failing to impeach Christina Thompsona with "her prior statements to police." (Doc. 1, p. 19.) He also contends that counsel should have called the officer who interviewed Thompsona "for

13

such impeachment." (*Id.*) Sampson notes that Thompsona testified at trial that (1) "the first thing she noticed about the shooter when he was talking was the gold in his mouth," (2) she saw the shooter "pull the gun from his back pocket," (3) the shooter "used one hand to support his shooting arm," and (4) shortly before the three men arrived, Nelson "told [] Littles' group that 'I'm not (unintelligible) everybody, I'm going to have you all laid down.'" (*Id.*, p. 20.) Citing a police report, Sampson claims that Thompsona "never" shared any of these observations with law enforcement. (*Id.*, pp. 19-20.)

> The state postconviction court rejected this claim as follows:
>
> As an initial matter, the Court notes that the Defendant fails to establish that counsel was deficient. The excerpt of [the police] report attached to the Defendant's motion omits certain details and the Court is unable to discern whether these details were not asked or that [] Thompsona did not provide them. Notably, the report does not identify the shooter as a black male but [Thompsona] testified at trial that the males at the scene were black. Additionally, the report states "Christina [Thompsona] offered a very similar version of the incident as Alexis [Reed]." Further, counsel did elicit inconsistencies in her statements and argue them to the jury. Most notably, counsel elicited testimony that Ms. Thompsona picked out an individual from the photopack because of a scar on his head but did not see a scar on the Defendant's head during trial.
>
> Regardless, the Court finds that the Defendant fails to establish that he suffered prejudice for the reasons identified [above]. Thus, the Defendant fails to establish that counsel was ineffective . . . .

(Doc. 10-2, Ex. 18, p. 446 (record citations omitted).)

The state court reasonably applied *Strickland* in rejecting this claim. Even if counsel were permitted to impeach Thompsona with the police report, "there is nothing in the record showing how [she] would have responded if asked why the

statement did not mention" the facts to which she testified at trial. *Monteleone*, 2018 WL 1316234, at *5. Because the police report "is a summary of information [Thompsona] provided to police, not a transcript of a recorded statement," "it does not establish whether or not [she] told the police" the omitted information. *Id.* Moreover, counsel effectively cross-examined Thompsona on several topics, eliciting testimony that undermined her in-court identification of Sampson as the shooter. (Doc. 10-2, Ex. 6, pp. 521-22; *see also Davis v. Terry*, 465 F.3d 1249, 1256 (11th Cir. 2006) (affirming denial of ineffective-assistance claim because, among other things, "[c]ounsel extensively cross-examined the State's witnesses to show that they were not trustworthy").) Finally, for the reasons explained above, the state court reasonably concluded that Sampson was not prejudiced because, even apart from Thompsona's testimony, the prosecution presented overwhelming evidence of Sampson's guilt.

Ground Three is denied.

### D.    Ground Four

Sampson contends that trial counsel was ineffective for failing to impeach Danielle Spencer with her prior statements to law enforcement. (Doc. 1, p. 22.) Sampson points to an alleged inconsistency between (1) Spencer's trial testimony that the shooter "was aiming his gun through the windows of [a] vehicle directly at Christopher Reed," and (2) her statement to the police that "the shooter fired two shots into the air and one shot 'in another direction.'" (*Id.*) In his Rule 3.850 motion, Sampson cited several other discrepancies in Spencer's statements. (Doc. 10-2, Ex. 18, p. 35.) According to Sampson, counsel should have called Deputy Angela Simmons—

the officer who interviewed Spencer after the incident—so that Deputy Simmons could "testify as to what [] Spencer told her at the scene on the day of the incident." (Doc. 1, p. 23.)

The state postconviction court rejected this claim as follows:

The Defendant maintains that counsel was ineffective for failing to impeach Danielle Spencer with her prior inconsistent statements. Specifically, the Defendant attests that Ms. Spencer told Deputy Simmons that there were three other males with the shooter but at trial testified that there were only two; told Deputy Simmons that the shooter pointed a gun at her while opening the gate but testified at trial that she did not see the gun until everyone was outside; told Deputy Simmons that the shooter fired two shots in the air and a third in another direction but testified at trial and the shooter fired two shots in the air and a third shot aimed at Christopher Reed. The Defendant alleges that counsel should have called Deputy Simmons to impeach Ms. Spencer based on her statements made in the police report and that without counsel's errors, the outcome of the proceedings would have been different.

As an initial matter, the Defendant fails to establish that counsel was deficient. Counsel did question Ms. Spencer about her prior statements to Deputy Simmons regarding the number of males with the shooter, when the shooter pointed a gun at her, and about the number of shots and the direction they were fired. Thus, counsel was able to elicit testimony about Ms. Spencer's prior statements.

In addition, while defense counsel discussed possibly calling Deputy Simmons to testify in response to Ms. Spencer's testimony, [her] responses that she did not remember making certain statements prevented them from doing so. "This inability to remember is 'not synonymous with providing trial testimony that is inconsistent with a prior statement.'" *Brooks v. State*, 918 So. 2d 181, 200 (Fla. 2005); *see also James v. State*, 765 So. 2d 763, 766 (Fla. 1st DCA 2000); *Calhoun v. State*, 502 So. 2d 1364, 1365 (Fla. 2d DCA 1987). Based on the foregoing, the Defendant fails to establish that counsel was deficient.

Even if counsel was deficient, which the Court does not find, the Defendant fails to establish that he suffered prejudice. Several witnesses gave a similar description of the shooter and identified the Defendant as the shooter via photopack and in court. The tag on the car seen leaving

the scene of the incident was registered to the Defendant's girlfriend Marsha Eady. The Defendant made statements at the scene about someone messing with his cousin. It was determined that Kristina Nelson and the Defendant are first cousins. While there were slight discrepancies between Ms. Spencer's statements to police and at trial, the significant additional evidence against the Defendant coupled with Ms. Spencer's consistent statements as to identification of the Defendant outweigh any notion that there is a reasonable probability that the outcome of the proceedings would have changed with this impeachment.

(*Id.*, pp. 446-47 (record citations omitted).)

The state court reasonably rejected this ineffective-assistance claim. As the court correctly observed, counsel cross-examined Spencer about the prior inconsistent statements she made to Deputy Simmons. (*Id.*, Ex. 6, pp. 389-92.) Furthermore, counsel reminded the jury during closing argument that Spencer "was confronted with statements that she had made previously to a law enforcement officer." (*Id.*, p. 757.) Counsel cited Spencer's prior inconsistent statements that "there were three other black males with the shooter, not two others," that "the shooter shot two shots into the air and then one in the other direction," and that the shooter went "through the gate [and] pointed a gun at her before the argument." (*Id.*) Thus, Sampson failed to establish that counsel performed deficiently in addressing Spencer's testimony.

The state court also reasonably concluded that counsel was not deficient for failing to call Deputy Simmons. As the court noted, Spencer testified that she could not remember making certain statements to Deputy Simmons. (*Id.*, pp. 391-92.) In his Rule 3.850 motion, Sampson argued that Deputy Simmons "would have testified consistently with her police report and stated she accurately wrote down what Ms. Spencer told her, which would have rebutted Ms. Spencer's implication that the

Deputy's report was not correct." (*Id.*, Ex. 18, p. 34.) The state court found that, as a matter of Florida law, counsel could not "call[] Deputy Simmons to testify in response to Ms. Spencer's testimony" because Spencer's "inability to remember" was "not synonymous with providing trial testimony that is inconsistent with a prior statement." (*Id.*, pp. 446-47 (citations omitted).) This Court must defer to the state court's interpretation of Florida law. *See Harrison v. Sec'y, Dep't of Corr.*, No. 8:16-cv-704-SDM-AEP, 2020 WL 5814247, at *18 (M.D. Fla. Sept. 30, 2020) ("Whether [the witness's] statements to police were inconsistent with his trial testimony is an issue of state law, and a state court's determination of state law receives deference in federal courts.").

Finally, as discussed above, the state court reasonably concluded that Sampson failed to establish prejudice in light of "the significant additional evidence against [him] coupled with Ms. Spencer's consistent statements" identifying him as the shooter. (Doc. 10-2, Ex. 18, p. 447; *see also Julio Garcia, IV v. Sec'y, Dep't of Corr.*, No. 8:17-cv-2374-KKM-AAS, 2021 WL 1516070, at *10 (M.D. Fla. Apr. 16, 2021) (holding that, "in the light of the totality of the State's evidence of guilt, [petitioner] ha[d] not demonstrated a reasonable probability of a different outcome at trial had counsel impeached [the witness] as [petitioner] suggest[ed]").) Accordingly, Ground Four is denied.

### E.    Ground Five

Sampson contends that trial counsel was ineffective for failing to impeach Michelle Strovar "with her prior statements from her pre-trial deposition." (Doc. 1, p. 24.) Sampson notes that, during her deposition, Strovar stated that "the shooter was

wearing 'plaid shorts.'" (*Id.*, p. 25.) At trial, however, Strovar testified that the shooter "was wearing a light blue shirt and blue jeans." (*Id.*) Sampson also points to the inconsistency between (1) Strovar's trial testimony that "the shooter may have pulled the gun from his pocket," and (2) her deposition testimony that "she did not know where the shooter pulled his gun out from." (*Id.*)

> The state postconviction court rejected this claim as follows:
>
> As an initial matter, the Court notes that Ms. Strovar's testimony at trial is consistent with the statements contained in Deputy Busch's Police Report that the Defendant attaches to his motion. Thus, had counsel impeached the witness in this manner, the State could have refreshed her recollection with her prior consistent statements to law enforcement. In addition, Ms. Strovar testified at trial that she believes the shooter was wearing blue jeans or blue jean shorts but said she doesn't remember positively and noted that she doesn't recall much since the incident was over a year ago. Further, counsel impeached Ms. Strovar with inconsistent statements from her deposition and the 911 call. Therefore, the Defendant fails to establish that counsel was deficient.
>
> Moreover, the Defendant fails to establish that he suffered prejudice based on the significant evidence presented against the Defendant as outlined throughout the body of this order. Therefore, this claim is denied.

(Doc. 10-2, Ex. 18, pp. 447-48 (record citations omitted).)

The rejection of this claim was reasonable. As the state court noted, the police report reflects that Strovar told law enforcement that (1) the shooter wore "a light blue T-shirt" and "blue jeans," and (2) the shooter "pull[ed] a silver handgun from his right rear pocket." (*Id.*, p. 372.) These statements were consistent with Strovar's trial testimony. (*Id.*, Ex. 6, pp. 287-88, 324-25.) Thus, had counsel impeached Strovar with her deposition testimony, the prosecution could have "rehabilitated [her] testimony on

re-direct examination with [her] prior consistent statement[s]." *Harrison*, 2020 WL 5814247, at *18; *see also Monday v. State*, 792 So. 2d 1278, 1282 (Fla. 1st DCA 2001) ("[T]he trial court may exercise its discretion to admit a prior consistent statement as rehabilitation if it has some value in rebutting the prior inconsistent statement used for impeachment.").

Moreover, counsel impeached Strovar with several prior inconsistent statements from her deposition. For example, Strovar testified on direct examination that, prior to the incident, she had never seen the men who accompanied Nelson to the Littles residence. (Doc. 10-2, Ex. 6, pp. 288, 312.) On cross-examination, counsel confronted Strovar with her deposition testimony, in which she stated that she had seen "two of the guys at [Nelson's] house previously." (*Id.*, p. 323.) Ineffective assistance "is not established by the fact that other testimony might have been elicited" from additional impeachment of an already impeached witness. *Fugate v. Head*, 261 F.3d 1206, 1218 (11th Cir. 2001); *see also Galin v. Sec'y, Dep't of Corr.*, No. 8:08-cv-254-SDM-TBM, 2013 WL 1233125, at *9 (M.D. Fla. Mar. 27, 2013) (rejecting ineffective-assistance claim because petitioner "fail[ed] to support his speculative contention that further impeachment would have established reasonable doubt about his guilt").

Finally, for the reasons set forth above, the state court reasonably concluded that Sampson failed to show prejudice in light of "the significant evidence presented against" him at trial. (Doc. 10-2, Ex. 18, p. 448; *see also Haag*, 2017 WL 6550884, at *20 ("[Petitioner] fails to show that further impeachment of [the witness], despite the other evidence adduced at trial, would have resulted in a different outcome.").)

Ground Five is denied.

## F.     Ground Six

Sampson contends that trial counsel was ineffective for failing to impeach Bradley Alford "with his prior statements from his pre-trial deposition." (Doc. 1, p. 27.) Sampson notes that, during his deposition, Alford "testified that Christopher Reed . . .was not outside or present during" the shooting. (*Id.*) At trial, however, Alford stated that Reed was "outside during the shooting incident." (*Id.*, p. 28.) Sampson also points to the inconsistency between (1) Alford's deposition testimony that "he was outside during the entire incident and witnessed three individuals arrive at the scene and exit the gray Nissan," and (2) his trial testimony that "he never saw any individuals exit the Nissan, but he saw individuals enter the Nissan when leaving the scene." (*Id.*)

The state postconviction court denied this claim as follows:

As an initial matter, the Court notes that Mr. Alford's trial testimony that the Defendant challenges is consistent with the statements Mr. Alford gave to police on the day of the incident as reflected in Deputy Busch's report attached to the Defendant's Motion. Therefore, had counsel impeached this witness in the manner the Defendant describes, the State could have asked Mr. Alford about his prior statements to law enforcement which were consistent with his trial testimony. In addition, counsel cross-examined Mr. Alford on these issues at trial. Thus, counsel was not deficient.

Further, the Defendant fails to establish that he suffered prejudice by counsel's failure to impeach on these issues due to the significant evidence presented against the Defendant at trial. For the aforementioned reasons, this claim is denied.

(Doc. 10-2, Ex. 18, p. 448 (record citations omitted).)

The state court reasonably rejected this claim. First, the court was correct that Alford's trial testimony was consistent with the statements he gave to the police. (*Id.*, pp. 372-73; *see also id.*, Ex. 6, pp. 340-42.) Thus, if counsel had impeached Alford with his deposition testimony, the prosecution could have "rehabilitated [his] testimony on re-direct examination with [his] prior consistent statement[s]." *Harrison*, 2020 WL 5814247, at *18. Second, counsel did cross-examine Alford about whether Reed was outside during the shooting and whether he saw the men exit the Nissan. (Doc. 10-2, Ex. 6, pp. 340-44.) Indeed, counsel was able to get Alford to admit that "during the deposition," he said he "thought it was Christopher [Reed] that was not outside." (*Id.*, p. 341.) Third, as explained above, the state court reasonably concluded that Sampson could not show prejudice given "the significant evidence presented against [him] at trial." (*Id.*, Ex. 18, p. 448.) Accordingly, Ground Six is denied.

## G.    Ground Seven

Sampson contends that trial counsel provided ineffective assistance by "causing an invited error that resulted in the State making improper comments during closing argument." (Doc. 1, p. 30.) During the defense's closing argument, counsel stated, "In the criminal justice system, a one-track mind is a very scary thing. Why? Because life and liberty are at stake, that's why." (Doc. 10-2, Ex. 6, p. 747.) The prosecution objected on the grounds of "improper argument," and the court sustained the objection. (*Id.*) Counsel then stated, "In the constitution it says the government cannot

take away your life or liberty without due process of law." (*Id.*) The prosecution again objected, but this time the court indicated that it "would allow it." (*Id.*)

During its closing argument, the prosecution said, "The Constitution, life and liberty. This is not a death-penalty case, and it's not a life. I mean, that's not what we're here on today. Jury selection about death-penalty cases is different. You would have had many more questions." (*Id.*, p. 789.) Defense counsel objected. The court sustained the objection and instructed the jury to "disregard any comments about death-penalty cases." (*Id.*)

Sampson argues that counsel was ineffective because his "life and liberty" comment invited the prosecution to respond "that this was not a death penalty case." (Doc. 1, p. 30.) According to Sampson, had counsel "not invited the State's argument [about death penalty cases]," he "could have moved for and received a mistrial for such argument." (*Id.*, p. 31.)

The state postconviction court rejected this claim as follows:

The Defendant contends that counsel was ineffective for inviting error by making certain comments during closing argument. Specifically, the Defendant indicates that counsel stated "life and liberty are at stake" and that we "can't take away life or liberty without due process of law." The Defendant attests that these comments allowed the State to argue in response that this is not a life or death case. The Defendant claims that the State's response was improper because it informed the jurors of the possible penalties and "misled the jury by implying that the sentence the Defendant could receive was inconsequential, which likely influenced the verdict." The Defendant avers that counsel should have moved for a mistrial based on the response by the State and that the Court would have granted the motion.

As an initial matter, the Defendant fails to establish that counsel was deficient. Counsel objected to the State's comments and the Court

23

sustained the objection. In addition, the Court gave an instruction to the jury that they should disregard the State's comment. Therefore, counsel was not deficient.

Moreover, the Defendant fails to establish that he suffered prejudice. As noted [above], there was an abundance of additional evidence presented against the Defendant. Therefore, there is no reasonable probability that the improper comments affected the outcome of the trial. *See Braddy v. State*, 111 So. 3d 810, 837 (Fla. 2012) ("If the trial court erred in allowing the prosecutor to engage in improper argument but there is no reasonable probability that the improper comments affected the verdict, such error is harmless and does not require reversal.").

As to the Defendant's claim that but for counsel's errors a mistrial would have been granted, this claim is without merit. As the Florida Supreme Court explained in *Knight v. State*,

> The granting of a motion for mistrial is not based on whether the error is prejudicial . . . [r]ather, the standard requires that a mistrial be granted only when an error is so prejudicial as to vitiate the entire trial, such that a mistrial is necessary to ensure that the defendant receives a fair trial. . . . It has been long established and continuously adhered to that the power to declare a mistrial and discharge the jury should be exercised with great care and caution and should be done only in cases of absolute necessity.

76 So. 3d 879, 885 (Fla. 2011) (internal citations and quotations omitted). For the same reasons as noted above, the Defendant fails to establish that the State's brief and isolated comments were so prejudicial as to vitiate the entire trial.

Lastly, the Defendant's claim that the comments "misled the jury by implying that the sentence the Defendant could receive was inconsequential, which likely influenced the verdict" is speculative. Speculative claims cannot form the basis for postconviction relief. *See Spencer v. State*, 842 So. 2d 52, 63 (Fla. 2003); *Bass v. State*, 932 So. 2d 1170, 1172 (Fla. 2d DCA 2006) (citing *Jones v. State*, 845 So. 2d 55, 64 (Fla. 2003) ("pure speculation cannot be a basis for postconviction relief.")). For the aforementioned reasons, this claim is denied.

(Doc. 10-2, Ex. 18, pp. 448-49 (record citations omitted).)

The rejection of this claim was reasonable. Sampson argues that the prosecution's comment that this was "not a death-penalty case" "downplayed the penalty [he] would receive with a guilty verdict despite [his] facing and receiving a 20-year minimum mandatory prison sentence." (Doc. 1, pp. 30-31.) But, as the state court correctly noted, the trial court promptly instructed the jury to "disregard any comment about death-penalty cases." (Doc. 10-2, Ex. 6, p. 789.) "[J]urors are presumed to follow the court's instructions." *Brown v. Jones*, 255 F.3d 1273, 1280 (11th Cir. 2001) (collecting cases). Because this Court must "presume that the jurors followed the court's instructions to" ignore the prosecution's remark, Sampson's "attempt to prove prejudice is undermined." *Id.*; *see also United States v. Simon*, 964 F.2d 1082, 1087 (11th Cir. 1992) ("A curative instruction purges the taint of a prejudicial remark because a jury is presumed to follow jury instructions."); *Vazquez v. Sec'y, Fla. Dep't of Corr.*, 807 F. App'x 901, 905 (11th Cir. 2020) ("While the court did not expressly inform the jury that the comment was improper, we nevertheless presume that the jury followed the court's instruction to disregard the comment.").

Sampson also contends that, had counsel not invited the prosecution's comment about death-penalty cases, counsel could have moved for a mistrial based on the improper remark. "[A]lthough the issue of ineffective assistance . . . is one of constitutional dimension," a court "must defer to the state's construction of its own law when the validity of the [ineffective-assistance] claim . . . turns on state law." *Pinkney*, 876 F.3d at 1295. Whether a mistrial would have been granted based on the prosecutor's comment is a matter of Florida law. *See Fernandez v. Sec'y, Dep't of Corr.*,

25

No. 8:16-cv-2565-CEH-SPF, 2019 WL 3958269, at *8 (M.D. Fla. Aug. 22, 2019) ("Whether a motion would have succeeded under Florida's standard for granting a mistrial is a question of state law."). Accordingly, this Court is bound by the state court's determination that a mistrial would not have been granted. *See Herring v. Sec'y. Dep't of Corr.*, 397 F.3d 1338, 1354-55 (11th Cir. 2005) ("The Florida Supreme Court already has told us how the issues would have been resolved under state law had [counsel] done what [the appellant] argues he should have done. . . . It is a fundamental principle that state courts are the final arbiters of state law, and federal courts should not second-guess them on such matters.").

Finally, the state court reasonably concluded that, in light of the "abundance of additional evidence presented against" him, Sampson was not prejudiced by the prosecutor's remark. (Doc. 10-2, Ex. 18, p. 449; *see also United States v. Baptiste*, 618 F. App'x 593, 600 (11th Cir. 2015) (no prejudice from improper remark during closing argument because prosecution presented "significant evidence of Defendant's guilt," and "[t]he district court promptly sustained Defendant's objection and instructed the jury to disregard the Government's comment").) For all of these reasons, Ground Seven is denied.

### H.   Ground Eight

Sampson argues that trial counsel was ineffective for failing to investigate and call two alleged alibi witnesses—Karl Keehn and Sabrina Nichols-Keehn. As noted above, the shooting took place on November 21, 2014. Sampson argues that Keehn and Nichols-Keehn would have testified that he was at their house at some point

between November 21, 2014 and November 23, 2014. (Doc. 1, pp. 32-36.) Sampson claims that counsel "never personally interviewed these alibi witnesses," instead relying on law enforcement's "interview and Police Report to ascertain the content and credibility of the proposed testimony." (*Id.*, p. 33.) According to Sampson, a "personal interview" with Keehn and Nichols-Keehn would have "encouraged" the potential witnesses to "verify the visit date." (*Id.*, pp. 34-35.)

The state postconviction court rejected this claim as follows:

The Defendant maintains that counsel was ineffective for failing to investigate or call Karl Keehn and Sabrina Nichols-Keehn as witnesses. Specifically, the Defendant claims that Karl Keehn would have testified that the Defendant had visited their home the weekend that the offense occurred and would have supported an alibi defense. In addition, the Defendant contends that Sabrina Nichols-Keehn would have testified that the Defendant was at her home at some point from November 21-23 and that she put this on her calendar. The Defendant indicates that counsel had filed an intention to claim an alibi, that these witnesses would have supported his alibi defense and that without counsel's errors, the outcome of the proceedings would have been different.

The Defendant fails to establish that counsel was deficient or that he suffered prejudice. As an initial matter, the Court notes that Sabrina Nichols-Keehn's and Karl Keehn's statements conflict with one another. Specifically, Karl Keehn states that the Defendant came over to help him with his vehicle. Karl Keehn told Detective Suess that he had poor memory but believed the Defendant came to his house on Sunday, November 23. However, Sabrina Nichols-Keehn told law enforcement that the Defendant came over to their house between November 21-23 to help them with her bills. When pressed, neither witness could specify what date the Defendant was at their home and could only pinpoint it to the weekend before Thanksgiving. While Ms. Sabrina-Keehn showed law enforcement the calendar on her phone documenting that the Defendant had come over to their house, when questioned about why that was the only entry she manually entered in her phone, [Sabrina-]Keehn gave evasive and unresponsive answers. In addition, both witnesses indicated that they would not be able to testify that the Defendant was at their home on Friday, November 21st. Based on the

conflicting, vague and uncertain testimony, the Court finds that the Defendant fails to establish that counsel was deficient or that he suffered prejudice for failing to call these witnesses.

Lastly, as noted throughout this order, there was an abundance of evidence presented at trial against the Defendant. Thus, the Defendant fails to establish that without counsel's errors, there is a reasonable probability that the outcome of the proceedings would have been different had counsel investigated and called these witnesses to testify at trial. Thus, this claim is denied.

(Doc. 10-2, Ex. 18, p. 450 (record citations omitted).)

The state court reasonably rejected this claim. "Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that [courts] will seldom, if ever, second guess." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995); *see also Ball v. United States*, 271 F. App'x 880, 884 (11th Cir. 2008) ("Trial counsel's decisions with regard to [defendant's] alibi witnesses were quintessential trial strategy."). "[T]o show that counsel's performance was unreasonable, the petitioner must establish that no competent counsel would have taken the action that his counsel did take." *Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

The state court reasonably concluded that counsel was not deficient for failing to investigate or call Keehn and Nichols-Keehn as alibi witnesses. As the court correctly observed, both witnesses told law enforcement that they could not "testify

under oath" that Sampson was at their house at the time of the shooting. (Doc. 10-2, Ex. 18, pp. 413-14.) Indeed, Nichols-Keehn said that she was only "25% sure" Sampson was at her house the day of the shooting, and Keehn said "he was not certain of the day" Sampson was there. (*Id.*) Furthermore, Keehn told police that he suffered from "short-term memory loss as a result of his time in the U.S. Air Force," and that he had "a very difficult time remembering things." (*Id.*, p. 413.) Because Keehn and Nichols-Keehn would have been extremely weak alibi witnesses, the Court cannot say that it was "patently unreasonable" for counsel to refrain from further investigating them or calling them at trial. *Kelly*, 820 F.2d at 1176; *see also Ball*, 271 F. App'x at 884 (holding that counsel was not ineffective for failing to call potential alibi witnesses because their testimony "would not have been particularly compelling and would have been subjected to vigorous impeachment").

Sampson appears to contend that Keehn and Nichols-Keehn would have provided more favorable testimony had counsel conducted a "personal interview" with them. (Doc. 1, pp. 34-35.) According to Sampson, such an interview "would have encouraged" the potential witnesses to "take [their] time with the answer and investigate the date of [his] visit more thoroughly." (*Id.*) The burden of establishing prejudice under *Strickland* "is particularly heavy where the petitioner alleges ineffective assistance in failing to call a witness because often allegations of what a witness would have testified to are largely speculative." *McKiver v. Sec'y, Fla. Dep't of Corr.*, 991 F.3d 1357, 1365 (11th Cir. 2021). Moreover, "a petitioner's own assertions about whether and how a witness would have testified are usually not enough to establish prejudice."

*Id.* Sampson provides no evidence that, had counsel personally interviewed Keehn and Nichols-Keehn, their testimony would have proven to be more favorable to the defense. Sampson's speculation on this point is insufficient to establish prejudice. *See Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001) ("[Petitioner] offers only speculation that the missing witnesses would have been helpful. This kind of speculation is insufficient to carry the burden of a habeas corpus petitioner.").

Finally, for the reasons explained above, the state court reasonably found that, even if counsel were deficient for failing to call these potential alibi witnesses, Sampson could not show prejudice in light of the "abundance of evidence presented at trial against" him. (Doc. 10-2, Ex. 18, p. 450.)

Ground Eight is denied.

## I.   Ground Nine

Sampson contends that trial counsel was ineffective for failing to file a motion to dismiss "the charges based on a lack of probable cause for the arrest." (Doc. 1, p. 37.) According to Sampson, the affidavit "used to secure the arrest warrant" contained "deliberately false statements or statements made with a reckless disregard for the truth, thereby misleading the judge into issuing the [] arrest warrant." (*Id.*, p. 38.) The affidavit in question was authored by Deputy Busch, who attested as follows:[2]

> Your Affiant interviewed Sylvia Littles and Christopher Reed as well as several witnesses, including Desean Tyler, Michelle Strowar [*sic*], and Bradley Allen Alford. From these witnesses your Affiant learned that at approximately 1348 hours on November 21, 2014, DAVID SAMPSON

---

[2] The warrant was issued for attempted murder in the first degree, but Sampson was ultimately charged with aggravated assault with a deadly weapon. (Doc. 10-2, Ex. 2, pp. 15-21.)

went to [the location where the shooting occurred], which is the home address of Sylvia Littles and Christopher Reed. DAVID SAMPSON was there because he believed Christopher Reed owed money to Christina Nelson. DAVID SAMPSON and Christina Nelson engaged in a verbal argument with Sylvia Littles and Christopher Reed. When Sylvia Littles and Christopher Reed refused to acknowledge that they owed any money, Christina Nelson told DAVID SAMPSON, "drop them bitches." At that time DAVID SAMPSON produced a silver in color semi-automatic pistol which he pointed at Sylvia Littles and Christopher Reed. DAVID SAMPSON discharged the firearm at Sylvia Littles and Christopher Reed multiple times. Your Affiant observed two .25 cartridge casings at the location where DAVID SAMPSON discharged the firearm. Sylvia Littles positively identified DAVID SAMPSON via a photographic array as the person who discharged the firearm. Christopher Reed was unable to identify DAVID SAMPSON.

Desean Tyler, Michelle Strowar [*sic*], and Bradley Alford all corroborated the statements of Sylvia Littles and Christopher Ryan [*sic*]. Desean Tyler is the boyfriend of Christina Nelson and assisted in the identification of DAVID SAMPSON. Your Affiant learned from Deputy Christopher Jacobs of the Pinellas County Sheriff's Office that he presented photographic lineups to two additional witnesses, Daniel [*sic*] Spencer and Alexis Reed, both of whom positively identified DAVID SAMPSON as the person who discharged the firearm at Sylvia Littles and Christopher Reed.

(Doc. 10-2, Ex. 2, pp. 16-17.)

Sampson contends that the affidavit was false because it relied on statements from Littles, Christopher Reed, Strovar, and Alford—all of whom subsequently offered trial testimony that was "materially inconsistent with their statements made to police." (Doc. 1, p. 38.) Sampson also argues that, because neither Strovar nor Alford "was able to identify [Sampson] as the shooter from the police photopack," the affidavit's statement that they "corroborated" Littles and Christopher Reed's testimony was false. (*Id.*) Additionally, in his Rule 3.850 motion, Sampson claimed that the affidavit incorrectly stated that Desean Tyler "assisted in the identification of"

Sampson as the shooter. (Doc. 10-2, Ex. 18, pp. 49-50.) According to Sampson, "counsel rendered ineffective assistance in failing to investigate the allegations in the affidavit and in failing to file a pre-trial Motion to Dismiss, which would have been granted had the [] false statements been removed." (*Id.*, pp. 50-51.)

The state postconviction court denied this claim as follows:

> The Defendant claims that counsel was ineffective for failing to file a motion to dismiss the information on the grounds that the arresting officer had no probable cause to arrest Defendant. Specifically, the Defendant maintains that several statements in the complaint/arrest warrant are false or misleading and when omitted, are not sufficient to establish probable cause for the arrest. The Defendant contends that without counsel's errors, the motion to dismiss would have been granted.

> The Court finds that counsel did not render deficient performance in failing to file a motion to dismiss the information because there is no reasonable probability that such a motion would have been granted. A motion to dismiss is appropriately raised when "[t]here are no material disputed facts and the undisputed facts do not establish a prima facie case of guilt against the defendant." *See* Fla. R. Crim. P. 3.190(c)(4). According to the complaint affidavit in the case, the Court issued a capias for the Defendant on November 28, 2014 for attempted murder in the first degree. The affidavit indicates that Desean Tyler who is the boyfriend of Kristina Nelson "assisted in the identification of David Sampson." The Defendant claims this statement is misleading, because Mr. Tyler initially identified the suspect as "Maurice" but later identified the suspect as David Sampson. Despite Mr. Tyler's amendments to his statements to police, the Court fails to find this statement false or misleading.

> The Defendant next argues that the affidavit was misleading when indicating that Michelle Strovar and Bradley Alford corroborated th[e] statements of Ms. Littles and Mr. Reed because neither Ms. Strovar nor Mr. Alford identified the Defendant as the shooter. However, Ms. Strovar and Mr. Alford's description of the shooter and the details surrounding the shooting affirmatively corroborate the statements by Ms. Littles and Mr. Reed. Further, the Court points out that the affidavit does not state that Ms. Strovar or Mr. Alford identified the Defendant as the

shooter. Thus, the Court does not find this portion of the affidavit to be false or misleading.

Accordingly, when the Defendant was arrested on July 9, 2015 for attempted murder in the first degree, law enforcement had probable cause, which is defined as "reasonable ground for belief of guilt," "particularized with respect to the person to be searched or seized," for his arrest. *Maryland v. Pringle*, 540 U.S. 366 (2003) (citing *Brinegar v. United States*, 338 U.S. 160, 175 (1949); *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)). Because law enforcement had probable cause for his arrest, no motion to dismiss based on the lack of probable cause would have been successful. Counsel cannot be deemed ineffective for failing to file a meritless motion. *See Ferrell v. State*, 29 So. 3d 959, 976 (Fla. 2010). Therefore, this claim is denied.

(*Id.*, pp. 451-52 (record citations omitted).)

The rejection of this claim was reasonable. Under the Fourth Amendment, "before a warrant for . . . arrest . . . can issue . . . the judicial officer issuing such a warrant [must] be supplied with sufficient information to support an independent judgment that probable cause exists for the warrant." *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 564 (1971). "Probable cause, in turn, is established when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed . . . an offense." *Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019) (citation omitted). "[T]o determine whether a misstatement in an officer's warrant affidavit amounts to a violation of the Fourth Amendment," courts (1) "ask whether there was an intentional or reckless misstatement or omission," and (2) "examine the materiality of the information by

inquiring whether probable cause would be negated if the offending statement was removed or the omitted information included." *Id.* at 1287.

The state court reasonably concluded that counsel was not deficient because there was no legal basis to seek dismissal of the charges. As an initial matter, the statement that Tyler "assisted in the identification of" Sampson was not false. In his Rule 3.850 motion, Sampson acknowledged that, although Tyler initially "implicated" "Maurice" as the shooter, he told law enforcement the day after the incident that he "had 'learned the name of the potential shooting suspect' from 'several sources,'" and "the shooter was David Sampson." (Doc. 10-2, Ex. 18, p. 49.) Thus, the affidavit correctly stated that Tyler helped law enforcement identify Sampson as the shooter.[3]

Likewise, Strovar and Alford's inability to identify Sampson from the photographic lineup did not render false the statement that they "corroborated" the testimony of Littles and Christopher Reed. Both Strovar and Alford witnessed the shooting, and their accounts of the incident were broadly consistent with the versions provided by Littles and Reed. (*Id.*, Ex. 6, pp. 275-314, 332-39, 396-426, 466-84.) Furthermore, as the state court correctly observed, the affidavit did not assert that Strovar or Alford identified Sampson as the shooter.

---

[3] Sampson does not argue that the affidavit was invalid because it omitted Tyler's initial identification of "Maurice" as the shooter. Any such argument would have failed. Even if the affidavit had included Tyler's initial identification of "Maurice" as the shooter, the affidavit would still be valid because "there remain[ed] sufficient content in the [] affidavit to support a finding of probable cause." *United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009). Among other things, the affidavit recounted that both Danielle Spencer and Alexis Reed had "positively identified" Sampson "as the person who discharged the firearm at" Littles and Christopher Reed. (Doc. 10-2, Ex. 2, p. 17.)

Sampson also argues that the affidavit was misleading because it relied on statements from Littles, Christopher Reed, Strovar, and Alford—all of whom subsequently offered trial testimony that was "materially inconsistent with their statements made to police." (Doc. 1, p. 38.) This argument fails. A petitioner cannot establish a Fourth Amendment violation based on "the mere fact that an informant's trial testimony contradicts information attributed to that informant in an affidavit supporting a warrant." *United States v. Novaton*, 271 F.3d 968, 987-88 (11th Cir. 2001). Instead, the petitioner must "must show that it is the agent, and not the informant, who has made misrepresentations." *Id.* at 988. Here, Sampson provides no evidence that Deputy Busch included false statements in his affidavit "knowingly and intentionally, or with reckless disregard for the truth." *Franks v. Delaware*, 438 U.S. 154, 155 (1978). Sampson's conclusory assertion that the affidavit contained deliberate or reckless falsehoods is insufficient because "[a]ffidavits supporting arrest warrants are presumptively valid." *Kapordelis*, 569 F.3d at 1309.

Accordingly, the state court reasonably concluded that counsel was not deficient because a "motion to dismiss based on the lack of probable cause" would have failed. (Doc. 10-2, Ex. 18, p. 452.) Ground Nine is denied.

## J.    Ground Ten

Sampson contends that trial counsel was ineffective for failing to request "the standard [j]ury [i]nstruction . . . regarding discharge of a firearm." (Doc. 1, p. 41.) Sampson was charged with two counts of aggravated assault with a deadly weapon. The operative information alleged that, "in the commission of [the] assault," Sampson

"did actually possess, use[,] and discharge . . . a firearm." (Doc. 10-2, Ex. 2, pp. 44-45.) Accordingly, the verdict form instructed the jury that, if it found Sampson guilty of aggravated assault, it must also determine whether he (1) "did actually possess and discharge a firearm during the commission of the offense," (2) "did actually possess a firearm during the commission of the offense," or (3) "did not actually possess a firearm during the commission of the offense." (*Id.*, pp. 76-79.)

The trial court instructed the jury that, if it found Sampson "committed an Aggravated Assault" and also found "beyond a reasonable doubt that during the commission of the crime, he actually possessed a firearm, [it] should find [him] guilty of Aggravated Assault with actual possession of a firearm." (*Id.*, p. 53.) But the jury did not receive the standard instruction on discharge of a firearm. That instruction reads:

> If you find that (defendant) committed (felony identified in § 775.087(2)(a)2, Fla. Stat.) and you also find beyond a reasonable doubt that during the commission of the crime, [he] [she] discharged a [firearm], you should find the defendant guilty of (felony) with discharge of a [firearm].

Fla. Std. Jury Instr. (Crim.) 3.3(d). The jury ultimately found that Sampson "did actually possess and discharge a firearm during the commission of the offense." (Doc. 10-2, Ex. 2, pp. 76-79.)

Sampson contends that, due to the omission of the standard instruction on discharge of a firearm, the jury was not told that "the State had to prove 'discharge of a firearm' 'during the commission of a crime' 'beyond a reasonable doubt.'" (Doc. 1, p. 42.) According to Sampson, counsel's "error failed to put the State's case to a

meaningful adversarial testing" and "produced a trial whose . . . special verdict finding

of 'discharge[]' . . . cannot be deemed reliable." (*Id.*)

> The state postconviction court rejected this claim as follows:
>
> The Defendant attests that counsel was ineffective for failing to request standard jury instruction 3.3([d]) pertaining to the discharge of a firearm during the commission of an aggravated assault. The Defendant indicates that he was charged with both possession and discharge of a firearm during the commission of the offense, but that the jury was only instructed as to possession. The Defendant maintains that this omission lowered the State's burden of proof and allowed the jury to find that the Defendant committed the offense and discharged a firearm at a lower standard than beyond a reasonable doubt. The Defendant argues that without counsel's errors, there is a reasonable probability that the outcome of the proceedings would have been different.
>
> . . .
>
> The Court finds that the Defendant fails to establish that he suffered prejudice. First, discharge of a firearm was not a contested issue at trial. All of the witnesses testified as to the discharge. Rather, the only contested issue at trial was the identification of the Defendant.
>
> Second, the Court does not find merit in the Defendant's argument that the lack of an instruction as to discharge reduced the State's burden of proof that the jury find the Defendant discharged the firearm beyond a reasonable doubt. The Information charged that the Defendant through the commission of the offense did possess, use, and discharge a deadly weapon, to wit: a firearm. The jury's verdict reflects that the Defendant was found guilty as charged, and made further special findings that the Defendant did possess and discharge a firearm. Further, the jury was instructed on the presumption of innocence and the State's burden of proof. Notably, despite the lack of an instruction on the definition of discharge, the jury still found that the Defendant possessed and discharged a firearm. Notably, the jury verdict form [g]ave the jury an option to find that the Defendant solely possessed a firearm. Therefore, the Court finds that the Defendant fails to establish that the outcome of the proceedings would have been different had this instruction been included. Based on the foregoing, this claim is denied.

(Doc. 10-2, Ex. 18, pp. 452-53 (record citations omitted).)

The state court reasonably rejected this claim for lack of prejudice. The jury was not expressly instructed that the prosecution was required to prove beyond a reasonable doubt that Sampson discharged a firearm. But, as the state court noted, the jury was told that (1) the presumption of innocence "stays with the defendant as to each material allegation in the Information through each stage of the trial unless it has been overcome by the evidence to the exclusion of and beyond a reasonable doubt," (2) the prosecution "has the burden of proving the crime with which the defendant is charged was committed and the defendant is the person who committed the crime," (3) if the jury has "a reasonable doubt," it "should find the defendant not guilty," and (4) if the jury "returns a verdict of guilty, it should be for the highest offense which has been proven beyond a reasonable doubt." (*Id.*, Ex. 2, pp. 64, 72.)

Accordingly, "[t]he instructions as a whole made abundantly clear that a finding of guilt of the highest offense"—aggravated assault with a deadly weapon that Sampson discharged—"required proof of every material allegation . . . beyond a reasonable doubt." *Garrett v. Tucker*, No. 3:09-cv-468-MCR-CJK, 2012 WL 4038497, at *9 (N.D. Fla. Aug. 9, 2012), *adopted by* 2012 WL 4039684 (N.D. Fla. Sept. 13, 2012); *see also Kyle v. Sec'y, Dep't of Corr.*, No. 8:15-cv-267-JDW-AEP, 2017 WL 4539326, at *9 (M.D. Fla. Oct. 10, 2017) (holding that, because "the jury was repeatedly instructed that the State had the burden of proving its case beyond a reasonable doubt," petitioner could not show prejudice from failure to instruct the jury that "the State was required to prove beyond a reasonable doubt that [p]etitioner possessed a deadly weapon during

38

the offense"). For that reason, Sampson failed to show that, had the jury received the standard instruction on discharge of a firearm, the outcome of the trial would have been different. *See Torres v. Sec'y, Dep't of Corr.*, 843 F. App'x 203, 211-12 (11th Cir. 2021) ("[W]hen the jury instructions and the record are considered in the entirety, the state court's determination that, despite the erroneous instruction, the State retained the burden of proof and [petitioner] failed to establish prejudice is not an objectively unreasonable application of *Strickland* or its progeny."); *Whittier v. Sec'y, Fla. Dep't of Corr.*, No. 3:10-cv-166-MMH-JBT, 2013 WL 804281, at *21 (M.D. Fla. Mar. 5, 2013) (finding no prejudice or deficient performance where "the court's instructions, as a whole, adequately instructed the jury that the State's burden was to prove beyond a reasonable doubt all the elements of robbery as well as any aggravating circumstance, such as carrying a firearm during the commission of the robbery").

Because the state court reasonably found that Sampson was not prejudiced by the missing jury instruction, Ground Ten is denied.

### K.    Ground Eleven

Finally, Sampson contends that the cumulative effect of trial counsel's alleged errors "denied [him] his constitutional rights to due process, to a fair and impartial trial[,] and to the effective assistance of counsel." (Doc. 1, p. 45.) The state postconviction court rejected this claim. (Doc. 10-2, Ex. 18, p. 452.) It held that, "[b]ecause all of [Sampson's] claims have been denied, []his claim of cumulative error must also be denied." (*Id.*)

The rejection of this claim was reasonable. "Under the cumulative-error doctrine, a sufficient agglomeration of otherwise harmless or nonreversible errors can warrant reversal if their aggregate effect is to deprive the defendant of a fair trial." *Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014). A cumulative-error claim "must fail," however, where none of the "individual claims of error" has "any merit." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012). Here, there are no individual errors to accumulate, so Sampson's cumulative-error claim necessarily fails. *See Otero v. Sec'y, Dep't of Corr.*, No. 8:19-cv-39-SDM-AEP, 2022 WL 4095069, at *8 (M.D. Fla. Sept. 7, 2022) ("Because ground one is procedurally barred from federal review and ground two lacks merit, Otero proves no error to accumulate to show cumulative prejudicial effect."). Accordingly, Ground Eleven is denied.

It is therefore **ORDERED** that Sampson's petition for a writ of habeas corpus (Doc. 1) is **DENIED**. The **CLERK** is directed to enter judgment against Sampson and to **CLOSE** this case.[4]

<u>Certificate of Appealability</u>
<u>and Leave to Appeal *In Forma Pauperis* Denied</u>

---

[4] Sampson seeks an evidentiary hearing on his claims. The Court determines that an evidentiary hearing is not warranted. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."); *Landers v. Warden*, 776 F.3d 1288, 1295 (11th Cir. 2015) ("[B]efore a habeas petitioner may be entitled to a federal evidentiary hearing on a claim that has been adjudicated by the state court, he must demonstrate a clearly established federal-law error or an unreasonable determination of fact on the part of the state court, based solely on the state court record.").

It is further **ORDERED** that Sampson is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a certificate of appealability must first issue. *Id.* "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To obtain a certificate of appealability, Sampson must show that reasonable jurists would find debatable both (1) the merits of the underlying claims and (2) the procedural issues he seeks to raise. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Sampson has not made the requisite showing. Finally, because Sampson is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE** and **ORDERED** in Tampa, Florida, on August 29, 2023.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record
David Rohalia Sampson, *pro se*

41